## CLEVELAND VS. SOUTHARD, SAFFORD AND OTHERS.

EQUITY. — VENDOR AND PURCHASER *of mortgaged land : Acceptance of deed subject to mortgage, without covenanting to pay it — Rights and liabilities of the parties. — Foreclosure sale by collusion between purchaser and mortgagee : Equitable rights of vendor.*

1.  Where a purchaser of land accepts a deed expressly conveying it sub-ject to a mortgage, and excepting said mortgage from the covenants of warranty and against incumbrances, but does not himself covenant to pay it, the land is primarily liable as between him and the vendor; and the vendor is liable for any deficiency after a foreclosure sale, fairly made.

2.  Where such purchaser, by collusion with the mortgagee, buys the land at the foreclosure sale for a sum much less than its value, and less

than the mortgage debt, the sale should be set aside on the vendor's motion, if necessary to protect his interest.

3. Such collusion would be an equitable defense against the vendor's legal liability for the deficiency.

4. But if an action against the vendor, to enforce his personal liability, is pending in a court of *another state*, the court of this state by which the foreclosure judgment was rendered should set aside the fraudulent sale, and perhaps stay proceedings until the former action is determined.

5. If the purchaser finally accepted such deed and took possession under it, claiming title without seeking to have the deed reformed, he could not in the foreclosure suit avoid the legal effect of the deed, or of his collusion with the mortgagee, on the ground that when he made the purchase and paid a part of the price he was not aware of the existence of the mortgage.

APPEAL from the Circuit Court for *Green Lake* County.

In April, 1856, *Samuel Southard* and wife, in consideration of $3,025, the receipt of which is acknowledged, conveyed certain lands to *Daniel H. Safford.* Following the description of the land, in the deed, were these words: "The said land being subject to a mortgage executed by the parties of the first part, to the Milwaukee & Horicon Railroad Company, for seven hundred dollars." The deed contained the usual covenant of seizin; a covenant against all incumbrances except the mortgage before mentioned; and a covenant of warranty, "subject to the mortgage before mentioned." In September, 1865, *Cleveland* obtained a judgment of foreclosure of said mortgage, against *Southard, Safford,* and others; and in November following the lands were sold under said judgment to said *Safford* for $600, and the usual deed was executed by the sheriff and delivered to *Safford.* In January, 1869, *Southard* applied to the circuit court in which said judgment was rendered, for an order setting aside the sale and directing a resale. This motion was based upon the papers on file in the cause, and upon the following papers filed therewith: 1. The affidavit of *Southard.* This states that at the time of the sale of the

lands by him to *Safford*, they were worth $3,000, and that they were still worth that sum; that affiant, when he executed said mortgage to the railroad company, gave it also his note for $700, with interest at eight per cent, which was secured by the mortgage; that he had no notice of said foreclosure suit or judgment, and did not know that the suit had been commenced or the judgment rendered until about a year after the foreclosure sale; that previous to said sale (as affiant is informed and believes), it was agreed between *Safford* and *Cleveland* that the former should have the premises for $600, and that whatever sum was bid for the premises they should be struck off to *Safford*, and should not cost him more than $600, and *Cleveland* would look to affiant for the balance of said judgment; that this arrangement was, before said sale, publicly known in the neighborhood where the land is situate; that the sale was made in pursuance of this arrangement, without affiant's knowledge or consent; that a suit had lately been commenced against affiant by said *Cleveland*, in the state of Illinois, to recover the balance of said judgment; that affiant is informed and believes that said sale has never been confirmed by the court; and that, in case of a resale, affiant will bid and pay for said premises the amount of said judgment, with interest and costs. 2. Certified copies of depositions, on file in the circuit court of the United States for the northern district of Illinois, in behalf of the defendant *Southard*, in the cause of the Milwaukee & Horicon Railroad Company, suing for the use of said *Cleveland*, against said *Southard*. The deposition of *Daniel Safford* states, that during the progress of the aforesaid foreclosure suit he made a settlement with *Cleveland*, which he describes as follows: "I agreed to pay *Cleveland* $600, upon receipt of which he was to release the land. He said, if I would let it go to judgment I would have the land, and it should not cost me any more than $600. The reason he would not

release the mortgage was, because he wanted to hold the claim against *Southard*. He said, further, that * * * if I bid $600 at the sale, and any one bid more, it should cost me but $600. * * * During the negotiation, I told *Cleveland* that what I paid was my loss, as I had no claim against *Southard*. * * * The land was worth, at the time I made my settlement with *Cleveland*, $2,500." The depositions of one Troxall, and of one Olin, the sheriff by whom the land was sold at the foreclosure sale, confirmed the statement of *Safford* as to the arrangement between him and *Cleveland*, pursuant to which the sale was made. The deposition of one Waring stated that the land was worth $2,000 or $3,000.

Upon the hearing, affidavits were read in opposition to the motion, as follows: The affidavit of the defendant *Safford* states, that at the time of purchasing the premises in question, in 1856, he paid *Southard* over $2,900 therefor; that he had previously had considerable conversation with *Southard* about purchasing the land, and that the latter had never, at any such conversations, alluded to the fact that there was then a mortgage upon the property; that affiant had no notice or knowledge of the existence of such mortgage until after the delivery to him by *Southard* of said deed, and after affiant had paid him $1,000, and delivered to him a mortgage back upon the land to secure the remainder of said purchase-money.; that, after he discovered its existence, he left the deed in the office of *Southard's* attorney, declaring that he would have nothing to do with it, and immediately left the office to find *Southard;* that, finding him several days afterward, he told him that he would have nothing to do with said mortgage; that *Southard* told affiant that "he would rather have the railroad mortgage than not," and thereupon promised to come down in a day or two and "fix it up all right and satisfactory" to affiant; that he did not do so, but immediately, or within three or four days, left the

JANUARY TERM, 1870. 483

Cleveland vs. Southard, Safford and others.

state, and has not resided there since; and that affiant paid *Southard* for the land its full value, and more than a majority of the immediate neighbors thought it was worth.

The affidavit of one Pierce states, in substance, that he took part in a conversation with *Southard* and *Safford*, a few days after the conveyance of the land by the former to the latter, in which *Safford* told affiant that he had found there was a railroad mortgage on the land, and would not have it, to which *Southard* replied that "that need not be any serious objection, for he considered the railroad stock good, and would as soon keep it as to sell it;" and further said that "he would make it all right with *Safford*."

Two other persons made affidavit that the land in question was not worth over $2,700 at the time of *Safford's* original purchase.

The circuit judge made an order at chambers setting aside the sale, and directing the plaintiff to repay the $600 to *Safford*, with interest; and at the next term of the court it denied a motion to vacate said order. From this decision the defendant *Safford* appealed.

*Ryan & Kimball*, for appellant, argued that as between *Southard* and *Safford* the land would not be the primary fund without an agreement to that effect (*Belmont v. Cowan*, 22 N. Y. 438), and that there had been no such an agreement in this case; that the mere statement in the description that the land was subject to a mortgage has never, *of itself*, been held to amount to such an agreement, but when it is accompanied by the fact that the amount of the mortgage debt was deducted from the purchase-money, an agreement that the land should pay the mortgage is implied. *Frey v. Vanderhoof* 15 Wis. 397; *Briggs v. Seymour*, 17 id. 255; *Jumel v. Jumel*, 7 Paige, 595; *Ferris v. Crawford*, 2 Denio, 598. 2. If *Southard* became surety for the mortgage debt while the land was the principal, the

arrangement between *Cleveland* and *Safford* was a fraud upon *Southard*, and discharged him from that debt. 2 Am. L. C. 237, 275 ; *Band v. Leavitt*, 5 Ham. (O.) 207 ; 2 L. C. in Eq. 373, 374.

*Geo. D. Waring*, for respondent, to the point that the land is the primary fund for the payment of the mortgage debt, cited *Jumel v. Jumel*, 7 Paige, 591 ; *Cox v. Wheeler*, id. 248 ; *Cheney v. Monro*, 2 Barb. Ch. 618 ; *Tripp v. Vincent*, 3 id. 613 ; *Tice v. Annin*, 2 Johns. Ch. 125 ; *Brewer v. Staples*, 3 Sandf. Ch. 579. If it is alleged that a fraud was perpetrated by *Southard*, it is a proper subject for a suit against him by *Safford*, in which the former would have a chance to defend, and show by proof that there was no fraud, and that the railroad stock for which the mortgage was given was sold by *Safford* as part consideration for his taking the land subject to the mortgage.*

PAINE, J. The deed from *Southard* to *Safford* must have effect according to its terms. There is no attempt to reform it on the ground of mistake ; and whatever dissatisfaction *Safford* may have felt, when he first learned of the existence of the railroad mortgage, and the exceptions against it in the deed, must be considered as of no avail after he finally accepted the deed, and took possession under it, claiming title.

Taking the deed, therefore, as expressing the real contract of the parties, we have no doubt that as between them the land was the primary fund for the payment of the mortgage.' True, there is no covenant by the purchaser to pay it, as is often the case, so that he could not be made personally liable. But the land is expressly conveyed subject to the mortgage ; it is excepted from the covenant against incumbrances ; and the covenant to warrant and defend the title is qualified by the addition, "subject to the mortgage before men-

* The facts as to this stock do not appear in this suit.—REP.

tioned." The intention was therefore clear, that the vendee was to take the land subject to the burden of that mortgage, and without any obligation on the part of his vendor to pay it. And the result was, that, although *Southard* remained personally liable to the holder of the mortgage, yet, as between himself and *Safford*, he had the undoubted right to have the land fairly sold in case of a foreclosure, and the proceeds applied to the payment of the mortgage debt.

The evidence offered on the motion shows clearly that this was not done ; but that, on the contrary, while the land was worth from $2,500 to $3,000, it was sold to *Safford* for $600, in pursuance of an arrangement with *Cleveland* that he should have it, at the sale, for that sum. It appears from *Safford's* testimony, that, during the negotiations, *Cleveland* was informed by him that whatever he paid was his loss, as he had no recourse upon *Southard*, so that *Cleveland* had actual knowledge that *Safford* had purchased subject to the mortgage. This being so, and the arrangement that the land should be sold on the foreclosure to *Safford* for $600 being obviously destructive of *Southard's* rights, provided he was still to remain personally liable to *Cleveland* for the deficiency, he would clearly be entitled to have the sale set aside, and the land resold.

But the counsel for the appellant suggests, that, upon this theory of the case, the arrangement between *Cleveland* and *Safford* would discharge *Southard* from any further personal liability to *Cleveland* for the debt. This is undoubtedly true. *Cleveland*, knowing of the terms of the sale from *Southard* to *Safford*, and that, as between them, *Southard* had the right to have the full value of the land applied to the payment of the mortgage, after collusively selling the land to *Safford* on the foreclosure, for a part only of the debt, when he knew that, if fairly sold, it would have much more than paid the whole of it, ought not to be allowed to enforce

the personal claim for the deficiency which he had himself thus caused, against *Southard*. And if the suit for this deficiency were pending in this state, we should hold, that as *Southard* had a complete equitable defense, he had no interest in having the mortgage sale set aside, and therefore the order setting it aside should not have been made.

But as that suit is in another state, and it is impossible to know what view may there be taken of the case, we have determined, that, upon all the facts here presented, it was proper for the judge of the circuit court to set aside the sale, though it might be also proper to make a further order staying all proceedings until the determination of the suit of *Cleveland* against *Southard*, and to make an actual resale finally contingent upon the result of that suit.

*By the Court.* — The order appealed from is affirmed.